Michael J. Reiser (133621)
  *michael@reiserlaw.com*
Matthew Reiser (315301)
  *matthew@reiserlaw.com*
Isabella Martinez (315299)
  *isabella@reiserlaw.com*
REISER LAW, p.c.
1475 N. Broadway, Suite 300
Walnut Creek, California 94596
Telephone: (925) 256-0400
Facsimile: (415) 510-2544

Tyler Meade (160838)
  *tyler@meadefirm.com*
Samuel Ferguson (270957)
  *sam@meadefirm.com*
Seena Forouzan (317777)
  *seena@meadefirm.com*
THE MEADE FIRM p.c.
12 Funston Ave., Suite A
San Francisco, California 94129
Telephone: (415) 724-9600
Facsimile: (925) 476-0304

*Attorneys for Plaintiffs*

*(Additional Counsel on Signature Block)*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Atkins Investment Partnership; Edward Atkins, trustee of the Edward M. Atkins Trust; Vernon James Armour, trustee of the Vernon James Armour, Trust dated 04/04/1988 and the Vernon James Armour Trust dated 08/14/2018; Ronald Berman, trustee of the Ronald Berman Revocable Trust; Elizabeth Blinderman; Paul Blinderman, trustee of the Paul Blinderman Revocable Trust; Joseph M. Boniecki; Patricia Booth, trustee of the Patricia Booth Revocable Trust and the Laurence O. Booth Irrevocable Family Trust | Case No. <br><br> **COMPLAINT FOR DAMAGES** <br><br> **DEMAND FOR JURY TRIAL** |

of 2012; Anne Burke; John Burke; Christopher John Burke; Francis Campise; Joseph Campolo, Jr. individually and as trustee of the Joseph P Campolo Jr. Revocable Trust; Joseph S. Chasen; Mari Christopherson, trustee of the Mari Louisa Christopherson Trust; Amy Chuckrow and Jonathan Stulgis, trustees of the Trust Under the Will of Robert Chuckrow Deceased; Sherwood Guernsey, trustee of the Carol C. Guernsey Irrevocable Trust; Phillip Crump; David Decker, Sr. individually and as trustee for the Mary Louise Decker Family GST Trust; David Decker, Jr., trustee of the 2017 Decker Family Irrevocable Gift Trust; 2012 DPDS Fund L.P.; Barbara Drumm; Dusty47 LLC; Four J Family LLC; Jeffrey Goldberg, trustee of the Jeffrey M. Goldberg Trust u/a dtd 08/01/1995; Harmony Investments LLC; Charles Harrold, III; Margaux Marbury Harrold; Stephanie Harrold, trustee of the Stephanie A. Harrold Revocable Trust; Nancy Lynn Morton, trustee of the Harrold Family Dynasty Trust; Charles Cotton Harrold IV, trustee of the C. Cotton Harrold IV Investment Trust; JP Morgan Trust Company of Delaware, trustee of the Trust Under the Will of Marion E. Horween FBO Nancy Horween Trust; JP Morgan Trust Company of Delaware, trustee of the Trust Under the Will of Marion E. Horween FBO Lisa Horween Kelly; Sally Jo Morris, trustee of

COMPLAINT FOR DAMAGES

the Suzanne Kanis Revocable Trust; Ronald D. Kaplan; Michael R. Kaskie; Kilrea Family Investments, LLC; Scott Kilrea, trustee of the Scott Kilrea Trust U/A DTD 04/14/1997; John Henry Koehler III; Sandra Sue Koehler; Karl Henry John Koehler III and Inna Koehler, trustees of the Jay Koehler and Inna Koehler Living Trust; Kreiseder Family LLC; LTR I LLC; Sheffee Lulkin; Shefee Lulkin & Associates, Inc.; John L MacCarthy, trustee of the John Leland MacCarthy Revocable Trust; John D. Marschall, trustee of the John D. Marschall Trust; Peter J. McDonald, trustee of the Peter J. McDonald Trust DTD 04/22/2010; William McKenna; Nancy Mengel; Robert Mueckler, II; Steven Patrick Nedelka; Holly Nelson-Johnson and Terry Nelson-Johson, trustees of the E. Holly Nelson-Johnson Family Irrevocable Trust; Mark Ordower, trustee of the Mark Ordower Revocable Trust; Ordower Investments; James Papesch; Peer Pedersen, Jr., trustee of the Declaration of Trust of Peer Pedersen; John Muehlstein, trustee of the Peer Pedersen Trust; Barry Lance Polonitza; Ruthmarie Connor, trustee of the Rollin Polonitza Family Trust; Mary Polonitza, trustee of the Jard Polonitza Separate Property Trust; Beri Lynn Polonitza, trustee of the Beri Lynn Polonitza Revocable Trust; Phillip Porpora, trustee of the Phillip Porpora Trust; Liza

COMPLAINT FOR DAMAGES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Reynolds Limited Partnership; RJDC Management Company LLC; Scott Anthony Ronan; Jerry G. Ryder; Kimberly Seeds; James Sharman; Victoria Clewell, trustee of the Ronald J. Sloane Family Trust; SSSB Partnership; Jonathan Stulgis, trustee of the Jonathan W. Stulgis Family Trust; Doris J. Wik; Frances Armour Williamson, trustee of the Frances Armour Williamson TTEE Revocable Trust of Frances Armour Williamson; Yiming Zhang; Stephen Jay Akana; Harminder Brar and Pearlene Brar as trustees of the Brar Family Trust; Robert Brilliant, trustee of the Brilliant Family Trust; Jerome Yap Chua; Orla Cunningham, LLC; Barry P. Garrison, trustee of the Barry P. Garrison; Eugene Goebel; Jessa Ann Goebel; Stephanie Marie Grein; Brent Horowitz and Heather Thompson as trustees of the Horowitz Family Trust; Julie Lewis; Stacy K. Li; Ronald McLeod, trustee of the Ronald McLeod Revocable Trust; John D. Michael; Daniel Michael and Lillian Leong as trustees of the Michael Leong Family Trust DTD 08/13/2013; Jennifer Mvongo, trustee of the Jennifer M. Mvongo Revocable Trust; Ramesh Patel and Alison Patel, trustees of the R. Patel and A. Patel TTEE, Kenew DBP U/A DTD 12/31/2016; David Malcolm Potts; Thomas F. Reiser, Jr.; James E. Salter; Ridge Sampson, trustee of the Ridge

COMPLAINT FOR DAMAGES

Sampson Revocable Trust; Aaron Michael Silva; Gerald Guy Stokes, Jr.; Max Luis Tejada; Trinh-Mai N. Vo; Bret M. Walberg; Michael Witlin; Bennet Woodward; Dimitri Katamanin, individually and as trustee of the Four Season's Trust; Sameer Kero, trustee of the Flexedge Investment Management Defined Benefit Pension Plan & Trust; Sameer Kero; Chanda Mehta Kero; N. Kero Investments, LTD., LLLP; S. Kero Limited Partnership; Niloufer Kero; Niloufer Kero, trustee of Niloufer Kero Revocable Family Trust; Shawkat Kero; Sarita Mehta; Narendrakumar Mehta; Smita Mehta; Pareshkumar Desai; Etienne Boillot and Stuart E. Lucas, trustees of the GST Trust; Anthony V. Dub; Michael Driscoll; Neal Driscoll; Alia Driscoll; Dennis J. FitzSimons; U.S. Bank N.A and Soyla V. Rausch as trustee for the Carrie G. Cox TUW Tr. B FBO Mary Hancock and the Harriet C. Collis TUA Tr. B FBO Mary Hancock; William Wayne Hancock III, trustee of the George B. Hancock Trust; John Vance Hancock; Nancy A.D. Hancock; Michael Harrigan individually and as trustee for the Michael J. Harrigan Trust; John H. Heuberger, trustee of the WBK 2012 Trust; Loeb Holding Corporation; Armando Pauker; SAS ARDIS; Vasundhara Tolia; Osman Uslu; Bret M. Walberg; Shai Wininger; Philip Nadel; Blair Ambach;

COMPLAINT FOR DAMAGES

Chancellor Capital; Sanjay Tolia; Vinay Tolia, trustee of the Sanjay Tolia 2014 Annuity Trust; and Jerry G. Ryder,

               Plaintiffs,

       v.

Duff & Phelps, LLC; and Does 1 through 20,

               Defendants.

The following Plaintiffs bring this action against Duff & Phelps, LLC ("Defendant" or, together with the Does, "Defendants") based upon the investigation of counsel and information and belief: Atkins Investment Partnership; Edward Atkins, trustee of the Edward M. Atkins Trust; Vernon James Armour, trustee of the Vernon James Armour, Trust dated 04/04/1988 and the Vernon James Armour Trust dated 08/14/2018; Ronald Berman, trustee of the Ronald Berman Revocable Trust; Elizabeth Blinderman; Paul Blinderman, trustee of the Paul Blinderman Revocable Trust; Joseph M. Boniecki; Patricia Booth, trustee of the Patricia Booth Revocable Trust and the Laurence O. Booth Irrevocable Family Trust of 2012; Anne Burke; John Burke; Christopher John Burke; Francis Campise; Joseph Campolo, Jr. individually and as trustee of the Joseph P Campolo Jr. Revocable Trust; Joseph S. Chasen; Mari Christopherson, trustee of the Mari Louisa Christopherson Trust; Amy Chuckrow and Jonathan Stulgis, trustees of the Trust Under the Will of Robert Chuckrow Deceased; Sherwood Guernsey, trustee of the Carol C. Guernsey Irrevocable Trust; Phillip Crump; David Decker, Sr. individually and as trustee for the Mary Louise Decker Family GST Trust; David Decker, Jr., trustee of the 2017 Decker Family Irrevocable Gift Trust; 2012 DPDS Fund L.P.; Barbara Drumm; Dusty47 LLC; Four J Family LLC; Jeffrey Goldberg, trustee of the Jeffrey M. Goldberg Trust u/a dtd 08/01/1995; Harmony Investments LLC; Charles Harrold, III; Margaux Marbury Harrold; Stephanie Harrold, trustee of

the Stephanie A. Harrold Revocable Trust; Nancy Lynn Morton, trustee of the Harrold Family Dynasty Trust; Charles Cotton Harrold IV, trustee of the C. Cotton Harrold IV Investment Trust; JP Morgan Trust Company of Delaware, trustee of the Trust Under the Will of Marion E. Horween FBO Nancy Horween Trust; JP Morgan Trust Company of Delaware, trustee of the Trust Under the Will of Marion E. Horween FBO Lisa Horween Kelly; Sally Jo Morris, trustee of the Suzanne Kanis Revocable Trust; Ronald D. Kaplan; Michael R. Kaskie; Kilrea Family Investments, LLC; Scott Kilrea, trustee of the Scott Kilrea Trust U/A DTD 04/14/1997; John Henry Koehler III; Sandra Sue Koehler; Karl Henry John Koehler III and Inna Koehler, trustees of the Jay Koehler and Inna Koehler Living Trust; Kreiseder Family LLC; LTR I LLC; Sheffee Lulkin; Shefee Lulkin & Associates, Inc.; John L MacCarthy, trustee of the John Leland MacCarthy Revocable Trust; John D. Marschall, trustee of the John D. Marschall Trust; Peter J. McDonald, trustee of the Peter J. McDonald Trust DTD 04/22/2010; William McKenna; Nancy Mengel; Robert Mueckler, II; Steven Patrick Nedelka; Holly Nelson-Johnson and Terry Nelson-Johson, trustees of the E. Holly Nelson-Johnson Family Irrevocable Trust; Mark Ordower, trustee of the Mark Ordower Revocable Trust; Ordower Investments; James Papesch; Peer Pedersen, Jr., trustee of the Declaration of Trust of Peer Pedersen; John Muehlstein, trustee of the Peer Pedersen Trust; Barry Lance Polonitza; Ruthmarie Connor, trustee of the Rollin Polonitza Family Trust; Mary Polonitza, trustee of the Jard Polonitza Separate Property Trust; Beri Lynn Polonitza, trustee of the Beri Lynn Polonitza Revocable Trust; Phillip Porpora, trustee of the Phillip Porpora Trust; Liza Reynolds Limited Partnership; RJDC Management Company LLC; Scott Anthony Ronan; Jerry G. Ryder; Kimberly Seeds; James Sharman; Victoria Clewell, trustee of the Ronald J. Sloane Family Trust; SSSB Partnership; Jonathan Stulgis, trustee of the Jonathan W. Stulgis Family Trust; Doris J. Wik; Frances Armour Williamson, trustee of the Frances Armour Williamson TTEE Revocable Trust of Frances Armour Williamson;

COMPLAINT FOR DAMAGES

Yiming Zhang; Stephen Jay Akana; Harminder Brar and Pearlene Brar as trustees of the Brar Family Trust; Robert Brilliant, trustee of the Brilliant Family Trust; Jerome Yap Chua; Orla Cunningham, LLC; Barry P. Garrison, trustee of the Barry P. Garrison; Eugene Goebel; Jessa Ann Goebel; Stephanie Marie Grein; Brent Horowitz and Heather Thompson as trustees of the Horowitz Family Trust; Julie Lewis; Stacy K. Li; Ronald McLeod, trustee of the Ronald McLeod Revocable Trust; John D. Michael; Daniel Michael and Lillian Leong as trustees of the Michael Leong Family Trust DTD 08/13/2013; Jennifer Mvongo, trustee of the Jennifer M. Mvongo Revocable Trust; Ramesh Patel and Alison Patel, trustees of the R. Patel and A. Patel TTEE, Kenew DBP U/A DTD 12/31/2016; David Malcolm Potts; Thomas F. Reiser, Jr.; James E. Salter; Ridge Sampson, trustee of the Ridge Sampson Revocable Trust; Aaron Michael Silva; Gerald Guy Stokes, Jr.; Max Luis Tejada; Trinh-Mai N. Vo; Bret M. Walberg; Michael Witlin; Bennet Woodward; Dimitri Katamanin, individually and as trustee of the Four Season's Trust; Sameer Kero, trustee of the Flexedge Investment Management Defined Benefit Pension Plan & Trust; Sameer Kero; Chanda Mehta Kero; N. Kero Investments, LTD., LLLP; S. Kero Limited Partnership; Niloufer Kero; Niloufer Kero, trustee of Niloufer Kero Revocable Family Trust; Shawkat Kero; Sarita Mehta; Narendrakumar Mehta; Smita Mehta; Pareshkumar Desai; Etienne Boillot and Stuart E. Lucas, trustees of the GST Trust; Anthony V. Dub; Michael Driscoll; Neal Driscoll; Alia Driscoll; Dennis J. FitzSimons; U.S. Bank N.A and Soyla V. Rausch as trustee for the Carrie G. Cox TUW Tr. B FBO Mary Hancock and the Harriet C. Collis TUA Tr. B FBO Mary Hancock; William Wayne Hancock III, trustee of the George B. Hancock Trust; John Vance Hancock; Nancy A.D. Hancock; Michael Harrigan individually and as trustee for the Michael J. Harrigan Trust; John H. Heuberger, trustee of the WBK 2012 Trust; Loeb Holding Corporation; Armando Pauker; SAS ARDIS; Vasundhara Tolia; Osman Uslu; Bret M. Walberg; Shai Wininger; Philip Nadel; Blair Ambach; Chancellor Capital;

1    Sanjay Tolia; Vinay Tolia, trustee of the Sanjay Tolia 2014 Annuity Trust; and

2    Jerry G. Ryder (collectively, "Plaintiffs").

3                                    **INTRODUCTION**

4         1.      This is an action for negligent misrepresentation, aiding and abetting

5    fraud, and aiding and abetting breach of fiduciary duty against Duff & Phelps for

6    enabling a massive fraud orchestrated by Brendan Ross ("Ross") through a $789

7    million private investment fund structure managed by Direct Lending Investments,

8    LLC ("DLI").  Duff & Phelps rubber-stamped DLI's false overvaluations of its

9    assets, with knowledge that investors would rely on them in making investment

10   decisions.

11        2.      Plaintiffs collectively invested over $100 million as "limited partners"

12   in DLI's feeder funds, which were formed by Ross to invest primarily in online

13   lending marketplaces.  Both before and throughout their investments, Plaintiffs,

14   their agents, and/or their registered investment advisors ("RIAs") performed

15   comprehensive due diligence regarding the value of Plaintiffs' investments.

16        3.      Duff & Phelps issued "independent" valuations regarding assets held

17   by DLI from October 2016 through January 2019.  As Duff & Phelps was aware,

18   DLI used Duff & Phelps to attract additional funds from investors.  To existing and

19   prospective investors, Duff & Phelps' involvement projected stability and

20   confidence, and corroborated DLI's purported steady, positive returns.

21        4.      Duff & Phelps' valuations, however, were simply duplications of the

22   false valuations assigned by DLI.  Duff & Phelps knew that the Fund's investments

23   were worth only a fraction of the values DLI assigned to them given to them.

24   Indeed, Duff & Phelps provided draft valuation reports for DLI's comments and

25   DLI pushed Duff & Phelps to adopt DLI's phony valuations and methodologies.

26   So Duff & Phelps did.  From the outset of its engagement and through January

27   2019, Duff & Phelps significantly overvalued DLI's investments to match DLI's

28

own internal valuations, despite having the information necessary to perform accurate valuations.

5.  Duff & Phelps' overvaluations were used to increase the amount of commissions Ross paid himself out of investor funds.  Duff & Phelps knew that DLI intended to use Duff & Phelps' participation as DLI's valuation firm to lend credibility and respectability to DLI and its overvaluations in order to attract investors.  Duff & Phelps knew that DLI touted that the internal overvaluations DLI reported to DLI's investors were subject to "independent" third party valuations performed by Duff & Phelps.  It also knew that its valuations would be relied upon by DLI's auditors and incorporated into DLI's financial statements.  Nevertheless, with full knowledge of the overvaluations, Duff & Phelps corroborated DLI's false valuations in the reports knowing that investors, like Plaintiffs, would rely upon the results of those valuations in making their investment decisions.

6.  Ultimately, the overvaluations were a substantial factor in creating the circumstances that forced DLI into Receivership and caused tens of millions of dollars in losses to Plaintiffs.

7.  On March 22, 2019, the Securities and Exchange Commission ("SEC") brought an action in the U.S. District Court for the Central District of California alleging that DLI's principal had fraudulently overvalued the funds' assets to induce investments and extract excess management and performance fees. *See SEC v. Direct Lending Invs., LLC*, No. 2:19-cv-2188 (C.D. Cal.) (Fischer, J.) (the "SEC Action").

8.  The Funds are now being liquidated by a court-appointed receiver (the "Receiver") who has reported that upward of 70% of the capital invested has been lost.  Through these proceedings, it has become apparent that Duff & Phelps' valuation reports were based on improper and inadequate valuation techniques, were misleading, and materially overstated the value of the funds' assets.

According to the Receiver's estimate, DLI's net asset value as of November 2018 was overstated by at least $459.4 million, with Duff & Phelps' valuation support.

9.     On September 3, 2020, the Receiver filed suit against Duff & Phelps alleging professional negligence, gross negligence, aiding and abetting breach of fiduciary duty, negligent misrepresentation and breach of contract.  *See Sharp v. Duff & Phelps*, No. 2:20-cv-08069 (C.D. Cal.) (Fischer, J.) (dismissed on *forum non conveniens* grounds on Jan. 28, 2021).

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. §1332(d)(11) in that: (a) this Complaint is brought on behalf of over 99 plaintiffs who assert common claims involving common questions of law and fact; (b) the total amount in controversy exceeds $5,000,000; (c) at least one plaintiff is diverse from the Defendant.

11.     Venue is proper in the Central District of California under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

12.     This Court has jurisdiction over Duff & Phelps because it is registered to do business in California and routinely does business in California.  Additionally, the vast majority of the acts and transactions complained of occurred in Los Angeles County, California.

13.     The amount in controversy for each Plaintiff exceeds $75,000 and is otherwise subject to the jurisdiction of this Court.

## PARTIES

**Defendants:**

14.     Duff & Phelps is a Delaware limited liability company, which is registered to do business in California and headquartered in New York, New York.

15.     The true names and capacities of the Does 1 through 20, whether individual, corporate, associate or otherwise, are unknown to Plaintiffs at the time

of filing this Complaint and Plaintiffs, therefore, sue said defendants by such fictitious names and will ask leave of court to amend this Complaint to show their true names or capacities when the same have been ascertained.  Plaintiffs are informed and believe, and therefore allege, that each of the Doe defendants is, in some manner, responsible for the events and happenings alleged herein and proximately caused injury and damages to Plaintiffs as herein alleged.

16.    Plaintiffs are informed and believe, and on that basis allege, that each defendant named in this action, including each of the Doe defendants, was the agent, ostensible agent, servant, aider and abettor, co-conspirator, partner, joint venturer, representative and/or associate of each of the other defendants, and was at all times relevant herein acting within the course and scope of his, her or its authority as agent, ostensible agent, servant, aider and abettor, co-conspirator, partner, joint venturer, representative and/or associate, and with the knowledge, authorization, consent, permission, and/or ratification of the other defendants.

17.    On information and belief, all actions of each defendant alleged herein were ratified and approved by the officers and/or managing agents of each other defendant, whether Doe or otherwise. The conduct, acts and omissions of Defendants, and each of them, as described herein, were undertaken by their officers, directors, or managing agents, identified as Does 1-10. The conduct of these officers, directors, or managing agents was, therefore, undertaken on behalf of Duff & Phelps. Further, Defendants, and each of them, had advance knowledge of the actions and conduct of those individuals, whose actions and conduct were ratified, authorized and approved by managing agents and by other officers, directors, or managing agents whose precise identities are unknown to Plaintiffs at this time. Plaintiffs thus identify and designate those individuals as Does 5-15.

**Plaintiffs:**

18.     Plaintiff Atkins Investment Partnership ("Atkins") is an Illinois partnership located in Glencoe, Illinois. Atkins purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

19.     Plaintiff Edward Atkins, a resident of Glencoe, Illinois, is the trustee of the Edward M. Atkins Trust ("Atkins Trust"). Atkins Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

20.     Plaintiff Vernon James Armour, a resident of Chicago, Illinois, is the trustee of the Vernon James Armour Trust dated 04/04/1988 and the Vernon James Armour Trust dated 08/14/2018 (collectively, the "Armour Trust"). The Armour Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

21.     Plaintiff Ronald Berman, a resident of Phoenix, Arizona, is the trustee of the Ronald Berman Revocable Trust ("Berman Trust"). The Berman Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

22.     Plaintiff Elizabeth Blinderman ("Blinderman") is an individual who resides in Chicago, Illinois. Blinderman purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

23.     Plaintiff Paul Blinderman, a resident of West Hollywood, California, is the trustee of the Paul Blinderman Revocable Trust ("Blinderman Trust"). Blinderman Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

24.     Plaintiff Joseph M. Boniecki ("Boniecki") is an individual who resides in Chicago, Illinois. Boniecki purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

25.     Plaintiff Patricia Booth, a resident of Chicago, Illinois, is the trustee of the Patricia Booth Revocable Trust ("Booth Trust"). The Booth Trust purchased

securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

26.     Plaintiff Patricia Booth, a resident of Chicago, Illinois, is the trustee of the Laurence O. Booth Irrevocable Family Trust of 2012 ("Booth Family Trust"). The Booth Family Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

27.     Plaintiff Anne Burke ("A. Burke") is an individual who resides in Houston, Texas. A. Burke purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

28.     Plaintiff John Burke ("J. Burke") is an individual who resides in Houston, Texas. J. Burke purchased securities from DLIF in the principal amount of $160,000.00.

29.     Plaintiff Christopher John Burke ("C. Burke") is an individual who resides in Lake Forest, Illinois.  C. Burke purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

30.     Plaintiff Francis Campise ("Campise") is an individual who resides in Chicago, Illinois.  Campise purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

31.     Plaintiff Joseph Campolo, Jr. ("Campolo") is an individual who resides in Winnetka, Illinois. Campolo purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

32.     Plaintiff Joseph Campolo, Jr. is also the trustee of the Joseph P Campolo Jr. Revocable Trust ("Campolo Trust"). The Campolo Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

33.     Plaintiff Joseph S. Chasen ("Chasen") is an individual who resides in Glenview, Illinois. Chasen purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

34.     Plaintiff Mari Christopherson, a resident of Chicago, Illinois, is the trustee of the Mari Louisa Christopherson Trust ("Christopherson Trust"). The Christopherson Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

35.     Plaintiffs Amy Chuckrow and Jonathan Stulgis, both residents of Charlestown, Massachusetts, are the trustees of the Trust Under the Will of Robert Chuckrow Deceased ("Amy Chuckrow Trust"). Plaintiff Sherwood Guernsey, a resident of Williamstown, Massachusetts, is the trustee of the Carol C. Guernsey Irrevocable Trust, which received the assets of the Carol Guernsey Trust Under the Will of Robert Chuckrow after Mrs. Guernsey passed (collectively, the "Guernsey Trust"). The Amy Chuckrow and Guernsey Trusts are the beneficial owners of funds initially invested by The Robert Chuckrow Trust in DLIF, which are in excess of $75,000. The Chuckrow Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

36.     Plaintiff Phillip Crump ("Crump") is an individual who resides in Douglas, Michigan. Crump purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

37.     Plaintiff David Decker, Sr. ("D.A. Decker") is an individual who resides in Longboat Key, Florida. D.A. Decker purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

38.     Plaintiff David Decker, Sr. is also the trustee for the Mary Louise Decker Family GST Trust ("Decker Family Trust"). The Decker Family Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

39.     Plaintiff David Decker, Jr., a resident of Sarasota, Florida, is the trustee of the 2017 Decker Family Irrevocable Gift Trust ("2017 Decker Trust"). The 2017 Decker Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

40.    Plaintiff 2012 DPDS Fund L.P. ("DPDS Fund") is an Illinois limited partnership.  DPDS Fund purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

41.    Plaintiff Barbara Drumm ("Drumm") is an individual who resides in Valparaiso, Indiana. Drumm purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

42.    Plaintiff Dusty47 LLC ("Dusty47") is a Delaware limited liability company.  Dusty47 purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

43.    Plaintiff Four J Family LLC ("Four J") is a Delaware limited liability company.  Four J purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

44.    Plaintiff Jeffrey Goldberg, a resident of Union Pier, Michigan, is the trustee of the Jeffrey M. Goldberg Trust u/a dtd 08/01/1995 ("Goldberg Trust"). The Goldberg Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

45.    Plaintiff Harmony Investments LLC ("Harmony") is a Michigan limited liability company.  Harmony purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

46.    Plaintiff Charles Harrold, III ("C. Harrold") is an individual who resides in Palm Beach Gardens, Florida.  C. Harrold purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

47.    Plaintiff Margaux Marbury Harrold ("M. Harrold") is an individual who resides in Palm Beach Gardens, Florida. M. Harrold purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

48.    Plaintiff Stephanie Harrold, a resident of Palm Beach Gardens, Florida, is the trustee of the Stephanie A. Harrold Revocable Trust ("Harrold

COMPLAINT FOR DAMAGES

Trust"). The Harrold Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

49.     Plaintiff Nancy Lynn Morton, a resident of Chicago, Illinois, is the trustee of the Harrold Family Dynasty Trust ("Harrold Family Dynasty Trust"). The Harrold Family Dynasty Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

50.     Plaintiff Charles Cotton Harrold IV, a resident of Palm Beach Gardens, Florida, is the trustee of the C. Cotton Harrold IV Investment Trust ("Harrold Investment Trust"). The Harrold Investment Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

51.     Plaintiff JP Morgan Trust Company of Delaware is the trustee of the Trust Under the Will of Marion E. Horween FBO Nancy Horween Trust ("N. Horween Trust"). The N. Horween Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

52.     Plaintiff JP Morgan Trust Company of Delaware is the trustee of the Trust Under the Will of Marion E. Horween FBO Lisa Horween Kelly ("L. Horween Trust"). The L. Horween Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

53.     Plaintiff Sally Jo Morris, a resident of Chicago, Illinois, is the trustee of the Suzanne Kanis Revocable Trust ("Kanis Trust"). The Kanis Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

54.     Plaintiff Ronald D. Kaplan ("Kaplan") is an individual who resides in Studio City, California.  Kaplan purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

55.     Plaintiff Michael R. Kaskie ("Kaskie") is an individual who resides in Chicago, Illinois.  Kaskie purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

COMPLAINT FOR DAMAGES

56.     Plaintiff Kilrea Family Investments, LLC ("Kilrea Investments") is an Illinois limited liability company. Kilrea Investments purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

57.     Plaintiff Scott Kilrea, a resident of Hilton Head Island, South Carolina, is the trustee of the Scott Kilrea Trust U/A DTD 04/14/1997 ("Kilrea Trust"). The Kilrea Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

58.     Plaintiff Karl John Henry Koehler III ("K. Kohler") is an individual who resides in New York, New York. K. Koehler purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

59.     Plaintiff Sandra Sue Koehler ("S. Kohler") is an individual who resides in New York, New York. S. Kohler purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

60.     Plaintiffs Karl Henry John Koehler III and Inna Koehler, both residents of New York, New York, are the trustees of the Jay Koehler and Inna Koehler Living Trust located (collectively "Koehler Trust"). The Koehler Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

61.     Plaintiff Kreiseder Family LLC ("Kreiseder") is a Delaware limited liability company. Kreiseder purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

62.     Plaintiff LTR I LLC ("LTR") is a Delaware limited liability company. LTR purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

63.     Plaintiff Sheffee Lulkin ("Lulkin") is an individual who resides in Skokie, Illinois.  Plaintiff Shefee Lulkin & Associates, Inc. ("Lulkin & Associates") is an Illinois corporation. Lulkin and/or Lulkin & Associates purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

64.     Plaintiff John L MacCarthy, a resident of Winnetka, Illinois, is the trustee of the John Leland MacCarthy Revocable Trust ("MacCarthy Trust"). MacCarthy Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

65.     Plaintiff John D. Marschall, a resident of Port St. Lucie, Floria, is the trustee of the John D. Marschall Trust ("Marschall Trust"). The Marschall Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

66.     Plaintiff Peter J. McDonald, a resident of Lake Bluff, Illinois, is the trustee of the Peter J. McDonald Trust DTD 04/22/2010 ("McDonald Trust"). McDonald purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

67.     Plaintiff William McKenna ("McKenna") is an individual who resides in Hobe Sound, Florida.  McKenna purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

68.     Plaintiff Nancy Mengel ("Mengel") is an individual who resides in Novato, California. Mengel purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

69.     Plaintiff Robert Mueckler, II ("Mueckler") is an individual who resides in Elgin, South Carolina. Mueckler purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

70.     Plaintiff Steven Patrick Nedelka ("Nedelka") is an individual who resides in Libertyville, Illinois. Nedelka purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

71.     Plaintiffs Holly Nelson-Johnson and Terry Nelson-Johson, both residents of Evanston, Illinois, are the trustees of the E. Holly Nelson-Johnson Family Irrevocable Trust (collectively "Nelson-Johnson Trust"). The Nelson-

Johnson Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

72.     Plaintiff Mark Ordower, a resident of Chicago, Illinois, is the trustee of the Mark Ordower Revocable Trust ("Ordower Trust"). The Ordower Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

73.     Plaintiff Ordower Investments ("Ordower Investments") is an Illinois partnership with its principal place of business in Chicago, Illinois. Ordower Investments purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

74.     Plaintiff James Papesch ("Papesch") is an individual who resides in Lake Forest, Illinois. Papesch purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

75.     Plaintiff Peer Pedersen, Jr., a resident of Chicago, Illinois, is the trustee of the Declaration of Trust of Peer Pedersen ("Pedersen DOT"). The Pederson DOT purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

76.     Plaintiff John Muehlstein, a resident of Chicago, Illinois, is the trustee of the Peer Pedersen Trust ("Pedersen Trust"). The Pedersen Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

77.     Plaintiff Barry Lance Polonitza ("Polonitza") is an individual who resides in Bonita Springs, Florida. Polonitza purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

78.     Plaintiff Ruthmarie Connor, a resident of Boulder, Colorado, is the trustee of the Rollin Polonitza Family Trust ("Polonitza Family Trust"). The Polonitza Family Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

79.     Plaintiff Mary Polonitza, a resident of Carlsbad, California, is the trustee of the Jard Polonitza Separate Property Trust ("Jard Polonitza Trust"). The Jard Polonitza Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

80.     Plaintiff Beri Lynn Polonitza, a resident of Boulder, Colorado, is the trustee of the Beri Lynn Polonitza Revocable Trust ("B.L. Polonitza Trust"). The B.L. Polonitza Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

81.     Plaintiff Phillip Porpora, a resident of Scottsdale, Arizona, is the trustee of the Phillip Porpora Trust ("Porpora Trust"). The Porpora Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

82.     Plaintiff Liza Reynolds Limited Partnership ("Reynolds") is an Illinois limited partnership.  Reynolds purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

83.     Plaintiff RJDC Management Company LLC ("RJDC") is an Illinois limited liability company.  RJDC purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

84.     Plaintiff Scott Anthony Ronan ("Ronan") is an individual who resides in Rochester Hills, Michigan.  Ronan purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

85.     Plaintiff Jerry G. Ryder ("Ryder") is an individual who resides in Lake Bluff, Illinois.  Ryder purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

86.     Plaintiff Kimberly Seeds ("Seeds") is an individual who resides in Naples, Florida.  Seeds purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

87.     Plaintiff James Sharman ("Sharman") is an individual who resides in Naples, Florida. Sharman purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

88.     Plaintiff Victoria Clewell, a resident of Lake in the Hill, Illinois, is the trustee of the Ronald J. Sloane Family Trust, which inherited the assets of an IRA established by Ronald J. Sloane ("Sloane Trust"). Mr. Sloane and/or the Sloane Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

89.     Plaintiff SSSB Partnership ("SSSB") is an Illinois partnership.  SSSB purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

90.     Plaintiff Jonathan Stulgis, a resident of Charlestown, Massachusetts, is the trustee of the Jonathan W. Stulgis Family Trust ("Stulgis Trust"). The Stulgis Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

91.     Plaintiff Doris J. Wik ("D.J. Wik") is an individual who resides in Farmington Hills, Michigan. D.J. Wik purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

92.     Plaintiff Frances Armour Williamson, a resident of Charlotte, North Carolina, is the trustee of the Frances Armour Williamson TTEE Revocable Trust of Frances Armour Williamson ("Williamson Trust"). The Williamson Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

93.     Plaintiff Yiming Zhang ("Zhang") is an individual who resides in Chicago, Illinois.  Zhang purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

94.     Plaintiff Stephen Jay Akana ("Akana") is an individual who resides in Berkeley, California. Akana purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

95.     Plaintiffs Harminder Brar and Pearlene Brar, both residents of Anaheim, California, are the trustees of the Brar Family Trust (collectively "Brar Trust"). The Brar Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

96.     Plaintiff Robert Brilliant, a resident of San Mateo California, is the trustee of the Brilliant Family Trust ("Brilliant Family Trust"). The Brilliant Family Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

97.     Plaintiff Jerome Yap Chua ("Chua") is an individual who resides in Danville, California. Chua purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

98.     Plaintiff Orla Cunningham, LLC ("Orla") is a California limited liability company. Orla purchased securities from DLIF in the principal amount of $260,956.21.

99.     Plaintiff Barry P. Garrison, a resident of Madera, California, is the trustee of the Barry P. Garrison ("Garrison Trust"). The Garrison Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

100.    Plaintiff Eugene Goebel ("E. Goebel") is an individual who resides in Pismo Beach, California. E. Goebel purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

101.    Plaintiff Jessa Ann Goebel ("J. Goebel") is an individual who resides in El Dorado Hills, California. J. Goebel purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

COMPLAINT FOR DAMAGES

102.   Plaintiff Stephanie Marie Grein ("Grein") is an individual who resides in San Francisco, California. Grein purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

103.   Plaintiffs Brent Horowitz and Heather Thompson, both residents of Corte Madera, California, are the trustees of the Horowitz Family Trust (collectively "Horowitz Trust"). The Horowitz Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

104.   Plaintiff Julie Lewis ("Lewis") is an individual who resides in Longmont, Colorado. Lewis purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

105.   Plaintiff Stacy K. Li ("Li") is an individual who resides in Santa Rosa, California. Li purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

106.   Plaintiff Ronald McLeod, a resident of Pleasanton, California, is the trustee of the Ronald McLeod Revocable Trust ("McLeod Trust"). The McLeod Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

107.   Plaintiff John D. Michael ("J.D. Michael") is an individual who resides in San Rafael, California. J.D. Michael purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

108.   Plaintiff Daniel Michael and Lillian Leong, both residents of Walnut Creek, California, are the trustees of the Michael Leong Family Trust DTD 08/13/2013 ("Michael Trust"). The Michael Leong Family Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

109.   Plaintiff Jennifer Mvongo, a resident of San Diego, California , is the trustee of the Jennifer M. Mvongo Revocable Trust ("Mvongo Trust"). The

COMPLAINT FOR DAMAGES

Mvongo Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

110.    Plaintiffs Ramesh Patel and Alison Patel, both residents of Mill Valley, California, are the trustees of the R. Patel and A. Patel TTEE, KENEW DBP U/A DTD 12/31/2016 (collectively, the "Patels"). The Patels purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

111.    Plaintiff David Malcolm Potts ("Potts") is an individual who resides in Berkeley, California. Potts purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

112.    Plaintiff Thomas F. Reiser, Jr. ("Reiser") is an individual who resides in Alamo, California. Reiser purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

113.    Plaintiff James E. Salter ("Salter") is an individual who resides in San Ramon, California. Salter purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

114.    Plaintiff Ridge Sampson, a resident of Mill Valley, California, is the trustee of the Ridge Sampson Revocable Trust ("Sampson Trust"). The Sampson Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

115.    Plaintiff Aaron Michael Silva ("Silva") is an individual who resides in Dallas, Texas. Silva purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

116.    Gerald Guy Stokes, Jr. ("Stokes") is an individual who resides in San Mateo, California. Stokes purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

COMPLAINT FOR DAMAGES

117.   Plaintiff Max Luis Tejada ("Tejada") is an individual who resides in Carlsbad, California. Tejeda purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

118.   Plaintiff Trinh-Mai N. Vo ("Vo") is an individual who resides in Dublin, California. Vo purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

119.   Plaintiff Bret M. Walberg ("Walberg") is an individual who resides in Goodyear, Arizona. Walberg purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

120.   Plaintiff Michael Witlin ("Witlin") is an individual who resides in Lafayette, California. Witlin purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

121.   Plaintiff Bennet Woodward ("Woodward") is an individual who resides in Cardiff by the Sea, California. Woodward purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

122.   Plaintiffs Dimitri Katamanin, individually and as the trustee of the Four Season's Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

123.   Plaintiff Sameer Kero, a resident of Chicago, Illinois, is the trustee of the Flexedge Investment Management Defined Benefit Pension Plan & Trust ("Flexedge Trust"). The Flexedge Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

124.   Plaintiff Sameer Kero ("S. Kero") is an individual who resides in Chicago, Illinois. S. Kero purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

125.   Plaintiff Chanda Mehta Kero ("C. Kero") is an individual who resides in Chicago, Illinois. C. Kero purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

COMPLAINT FOR DAMAGES

126.   N. Kero Investments, LTD., LLLP ("Kero Investments") is an Illinois limited liability limited partnership with its principal place of business in Chicago, Illinois. Kero Investments purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

127.   Plaintiff S. Kero Limited Partnership ("Kero LP") is a Florida limited partnership with its principal place of business in Brooksville, Florida.  Kero LP purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

128.   Plaintiff Niloufer Kero ("Niloufer Kero") is an individual who resides in Springhill, Florida. Niloufer Kero purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

129.   Plaintiff Niloufer Kero, a resident of Springhill, Florida, is the trustee of Niloufer Kero Revocable Family Trust ("Niloufer Kero Trust"). The Niloufer Kero Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

130.   Plaintiff Shawkat Kero ("Shawkat Kero") is an individual who resides in Jersey City, NJ.  Shawkat Kero purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

131.   Plaintiff Sarita Mehta ("Mehta") is an individual who resides in Chicago, Illinois.  Mehta purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

132.   Plaintiff Narendrakumar & Smita Mehta Joint ("N&S Mehta") are individuals who reside in Hoffman Estates, Illinois. N&S Mehta purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

133.   Plaintiff Pareshkumar Desai ("Pareshkumar Desai") in an individual who resides in Crystal River, Florida. Pareshkumar Desai purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

134.   Plaintiffs Etienne Boillot, a resident of Mamaroneck, New York, and Stuart E. Lucas, a resident of Chicago, Illinois, are the trustees of the GST Trust. GST Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

135.   Plaintiff Anthony V. Dub ("Dub") is an individual who resides in New York, New York.  Dub purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

136.   Plaintiff Michael Driscoll ("M. Driscoll") is an individual who resides in Louisville, Kentucky.  M. Driscoll purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

137.   Plaintiffs Neal Driscoll and Alia Driscoll (the "Driscolls") are individuals who reside in Bozeman, Montana.  The Driscolls purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

138.   Plaintiff Dennis J. FitzSimons ("FitzSimons") is an individual who resides in Naples, Florida. FitzSimons purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

139.   Plaintiffs U.S. Bank N.A., a national association incorporated in Delaware, Soyla V. Rausch are the trustee for the Carrie G. Cox TUW Tr. B FBO Mary Hancock ("First Hancock Trust").  The First Hancock Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

140.   Plaintiffs U.S. Bank N.A., a national association incorporated in Delaware, and Soyla V. Rausch are the trustee for the Harriet C. Collis TUA Tr. B FBO Mary Hancock ("Second Hancock Trust"), is domiciled in Naples, Florida. The Second Hancock Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

141.   Plaintiff, William Wayne Hancock III, a resident of Louisville, Kentucky, is the trustee of the George B. Hancock Trust ("G.B. Hancock Trust").

The G.B. Hancock Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

142.    Plaintiffs John Vance Hancock and Nancy A.D. Hancock (the "Hancocks") are individuals who reside in Easton, Connecticut. The Hancocks purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

143.    Plaintiff Michael Harrigan ("Harrigan") is an individual who resides in Tequesta, Florida. Harrigan purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

144.    Plaintiff Michael Harrigan, a resident of Tequesta, Florida, is the trustee for the Michael J. Harrigan Trust ("Harrigan Trust"). The Harrigan Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

145.    Plaintiff John H. Heuberger, a resident of Westminster, Colorado, is the trustee of the WBK 2012 Trust ("WBK Trust"). The WBK Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

146.    Plaintiff Loeb Holding Corporation ("Loeb") is a New York corporation with its principal place of business in New York, New York.  Loeb purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

147.    Plaintiff Armando Pauker ("Pauker") is an individual who resides in Glenview, Iliniois. Pauker purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

148.    Plaintiff SAS ARDIS ("SAS ARDIS") is a foreign holding company, in which David Spector invested. SAS ARDIS purchased securities from and/or invested in DLIF and/or DLIFF with the amount in controversy exceeding $75,000.

149.   Plaintiff Vasundhara Tolia ("V. Tolia") is an individual who resides in Bloomfield Hills, Michigan.  V. Tolia purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

150.   Plaintiff Osman Uslu ("Uslu") is competent adult.  Uslu purchased securities from and/or invested in DLIF and/or DLIFF with the amount in controversy exceeding $75,000.

151.   Plaintiff Bret M. Walberg ("Walberg") is an individual who resides in Goodyear, Arizona.  Walberg purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

152.   Plaintiff Shai Wininger a.k.a. Shay Wininger ("Wininger") is an individual who resides in Haifa, Israel. Wininger purchased securities from and/or invested in DLIF and/or DLIFF with the amount in controversy exceeding $75,000.

153.   Plaintiffs Philip Nadel and Blair Ambach ("Nadal/Ambach") are individuals who reside in Boca Raton, Florida, and Plaintiff Chancellor Capital is a Florida limited liability company (collectively, "Nadal/Ambach/Chancellor").  Nadal/Ambach/Chancellor purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

154.   Plaintiff Sanjay Tolia ("S. Tolia") is an individual who resides in Manhattan Beach, California. S. Tolia purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

155.   Plaintiff Vinay Tolia, a resident of Miami, Florida, is the trustee of Sanjay Tolia 2014 Annuity Trust ("S. Tolia Trust"). The S. Tolia Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

156.   Plaintiff Jerry G. Ryder ("Ryder") is an individual who resides in Lake Bluff, Illinois.  Ryder purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

COMPLAINT FOR DAMAGES

# GENERAL ALLEGATIONS

## A.    DLI's Investment Structure

157.   Brenden Ross founded DLI in 2012 to invest in online lending marketplaces and to manage several private funds organized in a "master-feeder" construct.  Ross was the founder, 100% owner, and Chief Executive Officer of DLI until he resigned on March 18, 2019.

158.   DLI managed several private funds organized in a "master-feeder" fund structure where limited partner investors, such as Plaintiffs, made direct investments in distinct companies called "feeder" funds.  These "feeder" funds, in turn, made investments through a "master" fund.

159.   DLI was the registered investment advisor and general partner of DLI Capital, Inc. which was the "master" fund which was the vehicle through which two private investments "feeder" funds invested (the "Master Fund").  DLI also was the general partner and investment manager of the two "feeder" funds, Direct Lending Income Fund, L.P. ("DLIF") and Direct Lending Income Feeder Fund, Ltd. ("DLIFF") (collectively with the Master Fund, the "Funds").  Ross controlled each of the Funds.

160.   The Funds principally invested in short-term loans, lines of credit, purchased receivables, and other debt obligations.

161.   Ross also held ownership stakes in a number of counterparties (i.e., borrowers), which were not made public or were concealed through stakes held by family members or family trusts.  Because of Ross' equity interests, DLI was not independent of these borrowers, and the transactions in which DLI invested were influenced by Ross's personal interests.

162.   DLI categorized the Funds' assets within a "fair value hierarchy" as Level 1, Level 2, or Level 3 assets depending on the data used to measure the fair value of the asset.

163.   Level 1 assets are those whose inputs can be verified through comparison to identical assets in the active market. Level 1 assets include, for example, stocks and bonds that have a mark-to-market mechanism for determining their value.

164.   Level 2 assets are those whose value can be approximated using models or extrapolation methods from known, observable price market values or other data. Level 2 assets include, for example, corporate bonds and mortgage-backed securities.

165.   Level 3 assets are those whose value cannot be determined through analysis of observable inputs such as market prices or models. Rather, the value of Level 3 assets must be determined through the best available information and may require some measure of estimation or risk-adjusted valuation.

166.   The majority of the assets in which DLI invested were Level 3 assets, meaning they were illiquid and could not be valued through observable measures such as market prices. The assets were supposed to be valued at fair market value. As a result, independent third-party valuations were of paramount importance. Indeed, without independent valuations, investors like Plaintiffs would be made to rely exclusively on DLI management's determination of the fair value of the Funds' assets.

167.   Independent valuation was particularly important because DLI charged investors both a management and performance fee based on the value of DLI's assets, and management would have incentive to inflate earnings to increase his own compensation.  DLI charged investors a monthly management fee based on 1% of the Master Fund's gross asset value, plus beginning of the month subscriptions minus redemptions. The performance fee was charged to investors when the Master Fund's net asset value exceeded its prior high net asset value, and was calculated as 20% of these earnings before interest and taxes. Thus, when DLI's portfolio was overvalued, investors were charged excessive fees, to the benefit of DLI.

COMPLAINT FOR DAMAGES

168.   At all relevant time periods, many of DLI's investment platforms were in financial distress, but those failing assets were hidden from DLI's investors.  DLI valued the positions internally on a monthly basis.  Through this internal valuation process, which was largely controlled by Ross and his employees, DLI artificially inflated DLI's asset values, and in turn, overvalued the funds.

169.   Duff & Phelps enabled this scheme by validating DLI's false valuations of those distressed platforms.

**B.**      **DLI Retains Duff & Phelps**

170.   In 2016, DLI sought to attract large institutional investors into the Funds, which required an independent third-party valuation of DLI's assets.  Thus, to bolster the value of the internal valuations, Ross decided to hire an outside valuation firm.  Ross had been resistant to having a third party perform actual independent valuations, even though DLI's earlier auditor suggested it.  He described the process as "annoying" and stated that he would like to avoid it.

171.   According to the Receiver, Ross quickly identified Duff & Phelps as the "independent" valuation firm that suited DLI's needs.  As Duff & Phelps was aware, DLI only wanted valuations from Duff & Phelps to help bring more investor money into the Funds, and it wanted those valuations to be a rubber stamp for its own.

172.   Duff & Phelps is an international valuation firm that provides valuation services worldwide.  Duff & Phelps touts its expertise and claims to "differentiate ourselves in our commitment to question assumptions, be the independent eye, critically analyze facts and tell our clients what they need to know to make sound decisions."

173.   Duff & Phelps recognizes the importance of accurate independent valuations to investors.  On its website, Duff & Phelps explains that "[i]ndependent reviews of fair value policies, procedures and results provide comfort to investors,

fund administrators and accounting managers as well as auditors regarding the entity's valuation assessment."

174.   In a March 16, 2016 publication on Duff & Phelps website, it acknowledges that inaccurate valuations could harm investors and may constitute a breach of fiduciary duty by managers:

> "The Importance of accurate valuation processes, particularly of hard-to-value assets, is critical.
>
> Inaccurate valuations can result in financial losses being incurred by investors, either via the subscription/redemption process for an open-ended fund vehicle or through secondary trades and misallocations of capital in a closed-ended vehicle. A failure to adhere to the basic principles of fair value NAV (Net Asset Value) may also constitute a breach by the manager of its fiduciary duty to act in the best interests of investors."

175.   On October 26, 2016, DLI retained Duff & Phelps to provide independent valuations of DLI's investments and to issue quarterly reports expressing opinions on the fair value of DLI's assets (the "Engagement Letter"). The final Engagement Letter incorporates language that DLI requested, providing that Duff & Phelps would apply its judgment "***in consultation with Management***" in generating a range of fair value estimates and assessing the reasonableness of DLI's internal estimates.

176.   At the outset, Duff & Phelps knew that DLI intended to use its valuations to meet regulatory reporting requirements and acknowledged that its valuation services were "being provided in conjunction with [DLI's] preparation and timely completion of certain reporting requirements."

177.   Duff & Phelps also knew that DLI intended to use its valuations to attract additional funding from investors and to project institutional stability and confidence to existing investors.  Indeed, the engagement letter included a provision that permitted DLI to reference Duff & Phelps in response to investor inquiry.

178.   After retaining Duff & Phelps, DLI began capitalizing on its bolstered credibility and broadcasting to existing and potential investors that it hired a valuation firm to support its valuations.  DLI touted in its private placement memoranda that it had an independent valuation firm in place, which gave comfort to prospective investors that the Funds were legitimate, financially sound investment funds that complied with regulatory requirements.  Upon information and belief, Duff & Phelps knew of that representation in the private placement memoranda.

179.   Further, in its periodic investor letters, DLI began directly identifying Duff & Phelps to investors as DLI's purportedly "independent" valuation firm. Through its investor letters and investor portal, DLI provided the Funds' investors with information concerning its assets under management, the valuation of different positions within its portfolio, and the performance of its different loan platforms.

180.   In DLI's February 2017 investor letter, DLI introduced Duff & Phelps: "Finally, to complement our comprehensive internal valuation approach, we have retained Duff & Phelps, a global leader in valuation consulting, to provide quarterly valuation ranges for the fund's assets. Using their independently formulated valuation range at the portfolio level, we validate our own methodology. Beyond simply confirming that our own valuations fall within their given range, we openly discuss discrepancies and conclusions with their team. Through this open dialogue on the analysis and inputs employed, we adapt our own process over time."

181.   In its July 2017 investor letter, DLI reminded investors that "we continue to use third-party valuation firm Duff & Phelps to provide us with an independent asset level quarterly valuation range on our investment assets."

182.   Duff & Phelps initially provided valuation reports quarterly, then began providing monthly reports in October 2018.  In its October 2018 investor letter, DLI once again emphasized Duff & Phelps' involvement and noted that the valuations were relied upon by DLI's auditors: "As you may know, the Funds work

with Duff & Phelps and Lincoln International to provide an independent valuation of each of the Fund positions. Duff is one of the preeminent firms in the third-party valuation space, with over 3,500 professionals in 28 countries. Lincoln is also widely respected, having 500 employees across 20 countries. The reporting we receive from Duff and Lincoln shows a valuation range for each Fund investment. We use these third-party valuations to provide independent support for our internal valuation methodologies and conclusions.  These reports are also made available to the Funds' auditors, Deloitte."

183.   In November 2018, DLI shared its purported monthly return with its investors and directly linked it to Duff & Phelps' valuation: "We have received our third-party valuation reporting from Duff & Phelps and Lincoln Partners, and we are able to confirm our previous estimate of 0.75% for the month ending October 31, 2018 is the final performance return for that month."

184.   Duff & Phelps knew that it was disclosed in those investor letters as DLI's "independent" valuation firm.  In reality, however, Duff & Phelps was anything but independent and instead falsely lent credibility to the scheme.

**C.    <u>Duff & Phelps Overvalues DLI's Assets in Valuation Reports</u>**

185.   DLI provided Duff & Phelps with detailed financial data regarding each of its investments on a regular basis.  Duff & Phelps never indicated that it lacked sufficient information required to perform an accurate valuation.  Despite this access and publicly available information, Duff & Phelps still dramatically overvalued many of DLI's investments in order to support DLI's own overvaluations.

186.   Despite understanding the purpose of the independent valuation and the incentive for DLI to inflate its internal valuations, Duff & Phelps put aside its own professional judgment in order to accommodate DLI, and it altered its methodology and conclusions to meet DLI's expectations.  Management valued DLI's investments without adequate consideration of borrower defaults, and Duff &

Phelps accepted that approach without testing the reasonableness of such assumptions. Duff & Phelps chose to forego preforming an analysis at the loan level and instead elected to adopt DLI's approach of forecasting cash flows at a single loss rate. Duff & Phelps accepted DLI's approach of modelling its valuation with a zero loss assumption— without using its professional judgment to determine independently whether that was reasonable under the circumstances of each platform.

187. Indeed, whenever Duff & Phelps suggested a range of fair values that did not comport with DLI's valuations, Duff & Phelps would work internally to identify what it could do to bring its valuations into DLI's predetermined ranges before preparing a draft valuation report. On one occasion, Duff & Phelps deleted various discount rate information as "not supportive/too low" in order to support DLI's desired valuations.

188. DLI would even give input into the draft reports themselves before they were finalized. Duff & Phelps would circulate drafts of each of its valuation reports to DLI so that DLI could comment on the range of fair values and the methodology Duff & Phelps used to calculate such ranges, and even the actual language used in the reports to describe the platforms and their risks.

189. According to the Receiver, DLI would frequently push Duff & Phelps to alter something to change the valuations. During the report preparation and revision process, DLI would call Duff & Phelps' attention to issues with its investments that Duff & Phelps did not effectively address. Other times, Duff & Phelps would observe something troublesome with DLI's investments; for example, a platform's "large number of defaulted loans" or that the accrued interest balances as a percentage of current balance for another investment was "peculiar." Duff & Phelps failed to act upon those observations by appropriately adjusting its valuation of the investments downward.

COMPLAINT FOR DAMAGES

190.   The Receiver also claims that, after receiving DLI's comments on the reports, Duff & Phelps would discuss whether DLI was happy or not and what valuations DLI wanted to be even higher.

191.   When Duff & Phelps eventually finalized its valuation reports, it represented within them that it had conducted its analyses in a manner that it obviously did not.  In addition to repeating that it had calculated the "fair value" of DLI's investments in accordance with ASC § 820, it made these untrue statements, among others:

- That it had verified the structure and logic of each model and analyzed all assumptions to ensure that they provided an adequate representation of risks;
- That it had analyzed all assumptions in light of actual and potential risks and assessed the relevance of each change in assumptions;
- That it had analyzed all assumptions in light of actual performance of the collateral; and
- That it had developed an appropriate valuation approach based on each Investment's characteristics and structure.

192.   In reality, Duff & Phelps made material mistakes and incorrect statements in the valuations, made gross errors in methodology and conclusion of value as to numerous DLI investments that resulted in massive overstatement of the value of DLI's investments; and failed to identify, discuss, disclose, analyze, or account for material risks to DLI's investments even when Duff & Phelps was aware of those risks.

193.   Duff & Phelps' reports substantially corroborated DLI's false valuations of Fund assets over a period of years.

194.   Duff & Phelps knew that the results of its valuations would be relied upon by DLI's auditors and incorporated within DLI's financial statements, which would be provided to investors.

*VoIP Guardian Loan Portfolio*

195.   Since 2015, DLI provided a revolving loan facility to VoIP Guardian ("VoIP").  VoIP was engaged in telecom factoring, which involved financing short-term commercial receivables of small "Tier 3" telecom providers.  Those providers purportedly had contracts with and receivables due from "Tier 1" telecom providers.

196.   DLI first invested in VoIP in 2015, providing $32.83 million as of December 31, 2015, to VoIP on a $50 million revolving loan facility.  The loan facility increased over the next three years with balances at fiscal year-end for 2016 and 2017 of $99 million and $180 million, respectively. By February 2019, the principal loan balance was $191.3 million, which was approximately 25% of DLI's aggregate net asset value.

197.   The collapse of VoIP began in 2017.  A Tier 1 provider, BT Nederlands, suspected that a Tier 3 provider that was factoring its receivables with VoIP was faking calls and engaging in money laundering.  It therefore withheld a $20 million payment due to that Tier 3 provider.  That left VoIP unable to repay that portion of DLI's loan.

198.   Despite the fact that DLI initially appraised the VoIP loans as being at a low risk of default due to the thought that Tier 1 providers would always pay, DLI and Duff & Phelps did not lower the valuation, and DLI kept lending money to VoIP.

199.   In its valuation reports, Duff & Phelps concluded that the payments to DLI are "guaranteed by large Tier 1 telecommunications carriers."  But Duff & Phelps did not name any of those supposed Tier 1 companies, identify any analysis of the amounts owed by each Tier 1 company, or explain the basis for its conclusion that such companies were credit worthy.

200.   Duff & Phelps' report as of March 31, 2018, still claimed that VoIP's performance is "guaranteed by large Tier 1 telecommunications carriers" that have

"strong credit," but fails to disclose the $21 million default arising from BT Nederlands. There also is no indication that Duff & Phelps independently evaluated the creditworthiness of the purported Tier 1 parties.

201. It was not until September 2018 that Duff & Phelps disclosed in its report that VoIP has had an unpaid receivable of $21 million, but it still failed to disclose that it had been outstanding since early 2017. Duff & Phelps also conceded that DLI put the $21 million receivable on non-accrual starting in March 2017, but never explained why Duff & Phelps failed to include that fact in any of its prior valuations. Yet again, Duff & Phelps abandoned professional judgment and continued to model VoIP with a "zero loss assumption."

202. By the end of 2018, two purported Tier 1 providers—Indigo11 and iKarim—began slowing payments. These providers eventually stopped making payments altogether, owing over $160 million.

203. VoIP ceased paying DLI in December 2018, and VoIP later filed for Chapter 7 bankruptcy.

204. The Receiver estimates that, as of November 2018, the effective date of Duff & Phelps' last valuation report, DLI and Duff & Phelps had overvalued DLI's investment in VoIP by $192.6 million.

### *QuarterSpot Loan Portfolio*

205. QuarterSpot, Inc. ("QuarterSpot") was an online small business lender. In August 2013, DLI entered into an agreement with QuarterSpot to purchase unsecured payment-dependent promissory notes from QuarterSpot. DLI funded thousands of QuarterSpot loans and was entitled to the principal and interest payments made by the underlying borrowers. Under this agreement, QuarterSpot would continue to service the loans in exchange for a service fee, which was a set percentage of the loan interest collected each month.

206.   As part of DLI's monthly reporting and closing process, QuarterSpot had to provide DLI with loan-level data, including performance and payment figures for each individual loan.

207.   QuarterSpot was not sustainable due to a high default rate on the underlying loans. To disguise QuarterSpot's defaults, Ross falsely reported returns. Specifically, Ross falsified payment figures to make it appear that payments had been made by borrowers when they had not been.  He directed QuarterSpot, as part of its monthly reporting to DLI, to "rebate" a portion of its servicing fees by making payments to DLI, that borrowers were making principal payments on seriously delinquent loans.

208.   Under DLI's valuation policy, many of these non-performing loans should have been marked down 50% or 100% but instead were valued at par because of the false payments.  This caused the QuarterSpot position to be overvalued and the Funds' net asset value to be inflated.

209.   As a result, between spring 2014 and fall 2017, DLI cumulatively overstated the valuation of the QuarterSpot position by at least $53 million and materially misrepresented its returns.  DLI collected at least $5-6 million in extra management and performance fees from the Funds that it would not have otherwise collected.

210.   In March 2019, upon discovering Ross's misconduct with respect to QuarterSpot after an internal investigation, a committee of senior DLI executives demanded that Ross formally resign and relinquish control of DLI, to which he acquiesced.

211.   According to the Receiver, Duff & Phelps observed red flags in QuarterSpot's loan tapes, even noting at one point that various loans were changed from being described as in default to merely just late.  Duff & Phelps failed to alter its analysis in the face of these red flags.

212.   Duff & Phelps' December 2016 draft report initially showed that QuarterSpot had $14.5 million in defaults.  The final report, however, provides that QuarterSpot had only $1.7 million in defaults and its valuation went up.  According to the Receiver, Duff & Phelps changed the report after DLI suggested that it had originally given Duff & Phelps the wrong loan tapes, and observed internally that DLI would "be pretty happy with that change."

213.   Duff & Phelps chose time and time again to abandon its independent judgment and did not appropriately account for the risk associated with the platform.

**D.    DLI Collapses**

214.   On February 11, 2019, DLI informed investors that DLIF and DLIFF had suspended withdrawals and redemptions effective February 8, 2019, due to the delinquency of the VoIP obligor payments on a $192 million loan.  For the first time, DLI informed investors that the Dutch government had been investigating VoIP since 2017, and that the cessation of payments was likely a result of undetermined misconduct, that a substantial portion of the outstanding $160 million loan balance might not be recoverable.

215.   On March 19, 2019, DLI informed investors that another of its positions, QuarterSpot, may have been materially overstated for a period of years. DLI further disclosed that Ross had formally resigned all of his positions with DLI on March 18, 2019.

216.   On March 22, 2019, the SEC filed the SEC Action charging DLI with a multi-year fraud that resulted in approximately $11 million in over-charged management and performance fees, and inflated returns.

217.   The SEC's complaint against DLI alleged that DLI had engaged in a multi-year fraud—perpetuated through Ross—that resulted in approximately $11 million in over-charges of management and performance fees to fund investors, and the inflation of DLI's private funds' returns.

COMPLAINT FOR DAMAGES

218.   On April 1, 2019, the Receiver was appointed to oversee the DLI Funds.

219.   In addition to the investments in QuarterSpot and VoIP Guardian, the Receiver also has liquidated numerous other DLI assets at a fraction of their reported value, demonstrating that Ross's fraud was not limited to overvaluing DLI's positions in QuarterSpot and VoIP Guardian.

220.   Plaintiffs are individuals, trusts, limited liability companies, and corporations, each of whom invested, made additional investments, and/or held their investments in DLIF and/or DLIFF in reliance on Duff & Phelps' purportedly independent valuation work.

221.   Plaintiffs have been damaged in the out-of-pocket loss of their investments, deprivation of access to their investment capital, the out-of-pocket loss stemming from the payment of taxes on phantom income, and payment of management and performance not properly owed to DLI.

222.   All conditions precedent to this action have occurred or have been waived.

## FIRST CAUSE OF ACTION

### (Negligent Misrepresentation)

223.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

224.   As set forth herein, Duff & Phelps had a duty, as a result of a special relationship — the valuation of DLI's assets — to give accurate information.  Duff & Phelps owed a duty to exercise reasonable care to investors and potential investors, including Plaintiffs, to perform accurate independent valuations.

225.   Duff & Phelps owed these duties directly to Plaintiffs separate and apart from the contractual duties it owed to DLI.  Duff & Phelps assumed the duty to prepare valuation reports that directly affected the financial statements for the benefit of the limited partners, including Plaintiffs.  Duff & Phelps knew and

acknowledged that Plaintiffs would rely on the results of its valuations and DLI's financial statements in making individual investment decisions.

226.   As alleged herein, Duff & Phelps made multiple false and misleading representations and omissions of material fact without reasonable grounds for believing them to be true.  Duff & Phelps made materially false and misleading representations, and omitted material information within its knowledge, concerning the value of the Funds' assets and the credibility of the valuations assigned by DLI. Duff & Phelps failed to conduct proper independent valuations of the Funds, instead issuing valuation reports that simply corroborated DLIF's and DLI Capital's false and inflated financial statements, which Duff & Phelps knew would be used to mislead Plaintiffs.

227.   Duff & Phelps knew that, given its special role as independent valuator, investors and potential investors, and specifically Plaintiffs, relied upon its independent valuations, particularly because the Funds invested in hard-to-value, illiquid Level 3 assets.

228.   Plaintiffs were the specific class of persons who relied upon Duff & Phelps valuations and who Duff & Phelps knew and intended would rely upon that work. Specifically, Duff & Phelps expected and intended that Plaintiffs would rely on Duff & Phelps' validation of DLI's valuations and financial statements in deciding whether to invest, hold their investments, or make additional investments in the Funds.

229.   Plaintiffs justifiably relied upon the materially misleading valuations prepared by Duff & Phelps, without knowing they were false, in deciding whether to invest, hold their investments, or make additional investments in the Funds.  They also relied on the accuracy of those valuations in making excessive management and performance fee payments.

230.   As a direct and proximate result of Duff & Phelps' negligent misrepresentations, Plaintiffs have been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### (Aiding and Abetting Fraud)

231.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

232.   As set forth more fully above, DLI and Ross perpetrated fraud on investors by overstating valuations, charging false management and performance fees, failing to disclose related- party transactions, and the misusing investor funds. Specifically, DLI and Ross knowingly engaged in a scheme to defraud Plaintiffs by:

- Making misrepresentations about DLI's assets, net income, and investment returns and valuations;
- Concealing DLI and its investment platforms' dire financial condition; and
- Overstating valuations to calculate and extract inflated management and performance fees from investors.

233.   As DLI's independent valuation firm, Duff & Phelps was responsible for conducting and applying reasonable valuation procedures to substantiate DLI's conclusions regarding the value of DLI's assets, including utilizing methods and techniques that were appropriate under the circumstances.

234.   Duff & Phelps knew, given its special role as independent valuator, that investors and potential investors, and specifically Plaintiffs, relied upon its independent valuations, particularly because the Funds invested in hard-to-value, illiquid Level 3 assets.

235.   Duff & Phelps knowingly and substantially assisted DLI and Ross in unlawfully defrauding Plaintiffs, by, among other things, issuing valuation reports

that corroborated DLI's false internal valuations.  Duff & Phelps knew that, by
verifying DLI and Ross' material misrepresentations concerning the value of DLI
assets and bolstering DLI's credibility with investors, its valuations would induce
Plaintiffs to invest, remain invested, or make further investments in the Funds.

236.   In connection with providing substantial and material assistance to
DLI and Ross, Duff & Phelps was aware of its role in the DLI/Ross fraud and acted
knowingly in assisting DLI and Ross.

237.   Duff & Phelps substantially benefited from its participation in the
DLI/Ross scheme.  The scheme caused Duff & Phelps to earn income from fees.

238.   Plaintiffs justifiably relied upon the materially misleading valuations
prepared by Duff & Phelps, without knowing they were false, in deciding whether
to invest, hold their investments, or make additional investments in the Funds.
They also relied on the accuracy of those valuations in making excessive
management and performance fee payments.

239.   As a direct and proximate result of Duff & Phelps' aiding and abetting
of fraud, Plaintiffs have been damaged in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

### (Aiding and Abetting Breach of Fiduciary Duty)

240.   Plaintiffs incorporate by reference the allegations contained in the
preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

241.   At all relevant times, DLI was the general partner of DLIF and DLIFF.
As general partner, DLI owed fiduciary duties to limited partners, including
Plaintiffs.

242.   At all relevant times, Ross was the CEO of DLI.  At all relevant times,
Ross maintained considerable control over DLI and had substantial discretion and
control over the Funds' investments and assets, Plaintiffs' investments, and the
Funds' communications to Plaintiffs.

243.   Ross and DLI's discretion and control gave rise to fiduciary duties to Plaintiffs as DLI and Ross occupied a superior position over Plaintiffs with respect to their management and control over their investments in the Funds, and had superior access to confidential information about DLI's investments and assets. DLI and Ross' superior position necessitated that Plaintiffs repose their trust and confidence in the DLI and Ross, and Plaintiffs did so by investing in the Funds and replying on DLI and Ross's purported expertise and skill.

244.   By reason of their controlling positions, actions, and direct and indirect representations to Plaintiffs, and by reason of the investors having deposited funds into Ross' control with the understanding he would act in accordance with their promises in regard to the use of such funds, DLI and Ross owed investors fiduciary duties of loyalty and care and to deal honestly and in good faith.

245.   DLI and Ross breached their fiduciary duties to Plaintiffs by, among other things, permitting them to be given fraudulent information concerning the financial condition of DLI.

246.   Based on its knowledge of DLI's business model and lending activity, Duff & Phelps knew that DLI and Ross owed fiduciary duties to investors, including Plaintiffs.  Duff & Phelps also knew that Ross and DLI had discretion and control giving rise to a fiduciary duty and duty of care to Plaintiffs.

247.   As demonstrated by the facts stated herein, Duff & Phelps knowingly provided substantially assistance to DLI and Ross' breaches of fiduciary duty with knowledge that they were breaching those duties by issuing false valuation reports that it knew would be used to mislead investors and failing to conduct proper independent valuations of the Funds.  Those breaches of fiduciary duty were enabled by and would not have been possible but for Duff & Phelps' actions and inaction.

COMPLAINT FOR DAMAGES

248.   As a direct and proximate result of Duff & Phelps' aiding and abetting of breach of fiduciary duty, Plaintiffs have been damaged in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

1. For special damages according to proof;
2. For general damages according to proof;
3. For attorneys' fees and costs according to proof;
4. For punitive and/or exemplary damages according to proof;
5. For pre-judgment and post-judgment interest; and
5. For such other and further relief as the court may deem proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: February 8, 2021          REISER LAW, p.c.

THE MEADE FIRM p.c.


By:    _/s/  Tyler Meade_
Tyler Meade
Attorneys for Plaintiffs

Additional Counsel for Plaintiffs on next page (With Pro Hac Vice Applications Forthcoming):

COMPLAINT FOR DAMAGES

Jeffrey C. Schneider, Esq.
   *jcs@lklsg.com*
Jason Kellogg, Esq.
   *jk@lklsg.com*
Victoria J. Wilson, Esq.
   *vjw@lklsg.com*
LEVINE KELLOGG LEHMAN SCHNEIDER & GROSSMAN LLP
201 South Biscayne Boulevard
22nd Floor, Miami Center
Miami, Florida 33131
Telephone: (305) 403-8788
Facsimile: (305) 403-8789

COMPLAINT FOR DAMAGES